UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| WENDY T. CARRICO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:13 CV 219 AGF / DDN |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security denying the application of plaintiff Wendy T. Carrico for disability insurance benefits under Title II and supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. § 1382. The action was referred to the undersigned United States Magistrate Judge for review and a recommended disposition under 28 U.S.C. § 636(b). For the reasons set forth below, the undersigned recommends that the decision of the Administrative Law Judge (ALJ) be reversed and remanded.

## I. BACKGROUND

Plaintiff, who was born in 1971, filed her applications on July 18, 2008, alleging disability due to human immunodeficiency virus (HIV) and hepatitis C. (Tr. 243, 296.) Her claims were denied initially. (Tr. 13, 243.) On May 5, 2010, following a hearing, an ALJ

---

[1]On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security. The court hereby substitutes Carolyn W. Colvin as defendant in her official capacity. F.R.Civ.P. 25(d).

found that plaintiff was not under a "disability" as defined in the Act. (Tr. 13.) Plaintiff filed a new application for disability benefits, alleging disability beginning May 5, 2010, and was granted disability on that application. (Tr. 13.) The Appeals Council accepted review of the ALJ's May 5, 2010 decision and remanded the matter to the ALJ for further consideration, specifically stating that plaintiff's disability status beginning on May 5, 2010, was not an issue on remand. (Tr. 13.) On February 23, 2012, following a second hearing, the ALJ again found that plaintiff was not under a "disability" as defined in the Act from September 22, 2008, her alleged onset date, through May 4, 2010. (Tr. 13-24.) Therefore, the February 23, 2012 decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL HISTORY

Plaintiff saw her primary care physician, James Hinrichs, M.D., from June 1996 through September 2005 for migraine headaches and chest pain. (Tr. 710-33.) He diagnosed HIV, anger, headaches, and abdominal pain. Plaintiff was taking Combivir and Viramune, both used to treat HIV. January 2005 records note difficulty sleeping, and plaintiff was prescribed Seroquel, a sleep aid. (Tr. 712.) September 2005 records also record back pain. She was prescribed, Flexeril, a muscle relaxant. (Tr. 710.) February 6, 2008 records note that her medications included Combivir and Viramune, as well as Xanax, for stress. (Tr. 411.)

On August 13, 2008, a Physical Residual Functional Capacity (RFC) evaluation completed by Mel Moore, M.D., a non-treating, non-examining medical source, indicated plaintiff could occasionally lift and carry 20 pounds; frequently lift and carry less than 10 pounds; and stand and walk for about 6 hours in an 8-hour work day. (Tr. 428-32.)

Plaintiff saw M. Lee Borrine, Ph.D., a psychologist, approximately five times between September and December 2008. She reported financial difficulties, a history of HIV, and depression. Her medications included Seroquel, for bipolar disorder, and Adderal, for Attention Deficit Hyperactivity Disorder (ADHD). On October 11, 2008, she stated that she had disturbed sleep and did not want to be around others. (Tr. 756-62.)

On October 29, 2008, plaintiff saw a psychiatrist, Michael Stotler, M.D. She reported an intentional drug overdose seven years prior, anger issues, apathy, decreased motivation, reduced focus, fatigue, crying, and poor sleep. Her mental status examination revealed that she had a disheveled appearance, a sad affect, and a depressed and anxious mood. Dr. Stotler diagnosed recurrent major depressive disorder and assigned a Global Assessment of Functioning (GAF) score of 58, indicating "moderate" symptoms. He prescribed Xanax and Seroquel, as well as Provigil, for excessive sleepiness. On December 22, 2008, plaintiff saw Dr. Stotler for sleep issues, including sleeping only six hours or less per night. Dr. Stotler prescribed Adderall and Seroquel. (Tr. 954-57.)

On February 25, 2009, plaintiff saw Dr. Stotler again. He noted continued sleep issues, diagnosed major depressive disorder, and adjusted her medications. (Tr. 952.)

From January to August 2009, plaintiff saw Dr. Borrine approximately six times. January 17, 2009 records note that plaintiff was afraid of other people. February 2009 records note she had a depressed, angry, and anxious mood, as well as paranoia and obsessive thoughts. March 2009 records note similar findings, as well as distractibility. (Tr. 748-53.)

On May 18, 2009, plaintiff saw Dr. Stotler, who noted some sadness and irritability. He diagnosed major depressive disorder and continued her medications. (Tr. 951.) On August 24, 2009, plaintiff saw Dr. Stotler again with complaints of mood swings, panic, anxiety, poor focus, poor sleep, and depression, particularly when thinking about returning to school or work. On September 17, 2009, plaintiff returned to Dr. Stotler and he continued her medications. (Tr. 924-27.)

On September 23, 2009, plaintiff saw Dr. Hinrichs for her HIV, depression, back pain, and anxiety. He noted sleep problems and continued her medications. (Tr. 685-86.)

On October 22, 2009, Dr. Stotler answered a Mental RFC Questionnaire. He listed diagnoses of major depressive disorder and Attention Deficit Disorder (ADD), assigned a GAF score of 58, and indicated that plaintiff's highest GAF score during the past year was 58. He listed her medications and their side effects, including drowsiness and lethargy. Dr. Stotler's

clinical findings included poor focus and concentration, mood swings, anxiety, depression, being easily overwhelmed, poor sleep, and apathy. He noted numerous signs and symptoms including decreased energy, mood disturbance, and sleep disturbance. Dr. Stotler noted plaintiff's inability to meet competitive standards in 10 areas needed to perform unskilled work, including, among others, carrying out simple instructions and making simple work-related decisions. He noted no useful ability to function in three other areas necessary for unskilled work, including maintaining attention and dealing with normal work stress. He indicated no useful ability to function in the four areas needed to perform skilled or semiskilled work. He indicated that plaintiff would need to miss more than four days per month due to her conditions. (Tr. 435-39.)

On October 30, 2009, plaintiff underwent a psychological evaluation by Dr. Borrine. She stated that she was depressed and worried every day about dying due to her HIV. She further reported low energy, remaining in bed all day, insomnia, and getting only three to four hours of sleep per night. Mental status examination revealed pressured speech and limited concentration. Dr. Borrine diagnosed bipolar affective disorder and ADD, assigned a GAF score of 45, indicating "serious" symptoms, and a highest GAF score of 45 during the past year. Dr. Borrine noted marked impairment with activities of daily living, social functioning, and concentration, persistence and pace. (Tr. 445-47.)

Dr. Borrine also completed a Mental RFC Questionnaire, noting signs and symptoms and numerous limitations in areas necessary to perform unskilled work. He opined that plaintiff had no useful ability to perform in nine such areas, and an inability to meet competitive standards in three such areas. He believed that she had no useful ability to perform in two areas necessary to perform skilled or semiskilled work, and an inability to meet competitive standards in the remaining two such areas. Dr. Borrine opined that plaintiff would need to miss more than four days per month due to her impairments. (Tr. 440-44.)

On November 3, 2009, Dr. Hinrichs completed a Medical Assessment Form addressing plaintiff's HIV. He believed that plaintiff's symptoms would frequently interfere with her

attention and concentration, that plaintiff could stand/walk less than two hours in an 8-hour workday, that plaintiff could sit about four hours in an 8-hour workday, and that plaintiff would require four unscheduled breaks for 10 minutes each. Dr. Hinrichs indicated that plaintiff was seriously limited in, but not precluded from, accepting instructions and responding to criticism, performing repetitive work at a consistent pace, and completing a normal workday without interruption from mental symptoms. (Tr. 448-55.)

On November 18, 2009, plaintiff saw her psychologist, Dr. Stotler. He noted that plaintiff felt irritable and depressed, and was experiencing low motivation, stress, and feelings of being overwhelmed. He assigned a GAF score of 54. (Tr. 931-35.)

On December 1, 2009, plaintiff saw Dr. Hinrichs for depression and back pain. She also reported nausea, vomiting, and diarrhea for the past month. Dr. Hinrichs believed that plaintiff had psychiatric and pain issues that might merit disability. He prescribed Vicodin, for pain; Xanax; and Ambien. (Tr. 790-94.)

On February 1, 2010, Dr. Borrine noted that plaintiff showed a labile, depressed, anxious, and angry mood, as well as distractible, obsessive, and compulsive thoughts. (Tr. 773.)

On February 18, 2010, Dr. Stotler noted that plaintiff was under financial stress, that she was irritable, and that she was experiencing nightmares, mood swings, and agitation. He diagnosed major depressive disorder and ADD, assigned a current GAF score of 54, and a highest GAF score of 54 over the past year.

In April 1, 2010 correspondence, Dr. Stotler stated that plaintiff had been under his care for several years, that she has been diagnosed with ADD and major depressive disorder, that she suffers from mood swings, severe anxiety, and panic attacks, that her focus remains poor, and that she has difficulty getting along with others or maintaining socially appropriate behavior. He stated that she can become hostile and irritable when under normal stress. He opined that because of her illness she was unable to maintain the focus and social skills necessary to remain employed. (Tr. 745.)

On May 17, 2010, plaintiff reported that she had to stop taking Seroquel due to adverse side effects, that she needed Trazodone to sleep, but that she was groggy in the morning and unable to get out of bed much. (Tr. 802-03.)

On June 29, 2010, plaintiff saw Timothy Graven, D.O., for neck pain that radiated to her upper extremity with numbness and tingling. Dr. Graven diagnosed cervical neck radiculopathy, ordered an MRI, and prescribed Mobic, a non-steroidal anti-inflammatory drug (NSAID), and Medrol, a corticosteroid. (Tr. 831.)

On July 13, 2010, plaintiff saw Dr. Graven again for continued neck and right arm pain, numbness, and tingling. He recommended physical therapy and epidural steroid injections. (Tr. 815-16, 832-34.)

On August 2, 2010, plaintiff saw pain specialist Armin Rahimi, D.O., for cervical neck pain and right arm radiculitis. Plaintiff reported cervical neck pain for the past two to three years that extended into the right arm and hand, as well as headaches. Examination revealed pain with motion. Dr. Rahimi treated her with a steroid injection in the neck and diagnosed cervicalgia or neck pain and disc bulges. (Tr. 887-91.)

During a September 14, 2010 visit, Dr. Stotler noted that plaintiff had continued irritability and anger, stress, financial problems, poor concentration, and some sadness and depression. Plaintiff stated that she could not afford Risperdal, a prescription medication used to treat bipolar disorder, until later in the week. (Tr. 872-73.)

On September 24, 2010, Dr. Stotler prepared a Mental Medical Source Statement. In activities of daily living, he noted moderate limitation in one area, marked limitation in one area, and extreme limitation in three of five areas. In social functioning, he noted moderate limitation in four areas, marked limitation in one area, and no extreme limitation. He noted extreme limitation in all five areas of concentration, persistence, and pace. He indicated that plaintiff would need to be absent three or more times per month, and that she would arrive late for work three or more times per month. He believed that the above limitations existed since at least 2008. (Tr. 804-07.)

During a December 16, 2010 visit with Dr. Stotler, plaintiff stated that she was very stressed due to financial problems. Her concentration was poor and she was experiencing some sadness and depression. (Tr. 939.)

**Testimony at the Hearings**

On May 23, 2010, plaintiff appeared and testified to the following at a hearing before the ALJ. (Tr. 33-66.) She has significant limitations arising from her condition. She has difficulty getting out of bed in the morning. She usually stays home in bed due to back pain. Due to her HIV and medications, she is sometimes sick for three days and then able to function for a couple days, but also she gets very tired. She is lucky to get four hours of sleep per night. She has good and bad days, and on bad days, which total about three weeks out of the month, she has anxiety, panic attacks, and stress. She is also fatigued and is sometimes not able to cook meals. She has frequent migraines, back pain, vomiting, and diarrhea, which she associates with effects from HIV medications. (Tr. 45-56, 51-54.)

At a second hearing on November 28, 2011, plaintiff appeared and testified to the following. (Tr. 69-85.) She lives with her mother, her eight year-old twins, and her grandson. She has a GED and certification as a forklift operator. (Tr. 71-73.)

A Vocational Expert (VE) also testified at the hearing. The ALJ stated that plaintiff's medical records and testimony suggest that plaintiff is functionally limited to medium exertional work, and due to her mental impairments, she is limited to unskilled work. Based upon these findings by the ALJ, the VE testified that plaintiff would be able to perform her past relevant work (PRW) as a convenience store clerk and snack bar attendant. (Tr. 81.)

The ALJ presented a hypothetical scenario with two additional limitations: the claimant should not work in a setting that includes constant regular contact with the general public and should not perform work that includes more than infrequent handling of customer complaints. The VE testified that no PRW would be available, but that other jobs would be available, such as housekeeping cleaner, hand presser, and electrode cleaner. (Tr. 82.)

Plaintiff's attorney asked the VE to assume a hypothetical individual with the same age, education, and past work history as plaintiff who would be limited to light exertion; who would be mentally limited to no more than occasional changes in the work setting; who would be limited to simple, repetitive, and routine tasks with only occasional decision making; who would be limited to no more than occasional contact with coworkers and no teamwork or tandem tasks; who would be limited to no more than occasional interaction with the general public; and who would have unscheduled absences from the workplace occurring on average four days per month. The VE testified that due to the number of days absent from work, no such work would be available. Plaintiff's attorney then said that he had no other questions for the VE. (Tr. 83-84.)

### III. DECISION OF THE ALJ

On February 23, 2012, the ALJ issued a decision that plaintiff was not disabled during the period from September 22, 2008 to May 2, 2010. (Tr. 13-24.) At Step One, the ALJ determined that plaintiff had not engaged in substantial gainful activity since her September 22, 2008 alleged onset date. At Step Two, the ALJ found that plaintiff had the severe impairments of bipolar disorder and ADD. She found that plaintiff's HIV and hepatitis C were medically determinable, but not severe impairments. At Step Three, the ALJ found that plaintiff did not suffer from an impairment or combination of impairments of a severity that met or medically equaled the required severity of a listed impairment at 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 16.)

Prior to Step Four, the ALJ determined that between September 22, 2008 and May 4, 2010, plaintiff retained the RFC to lift and carry 50 pounds occasionally and 25 pounds frequently. She could understand, remember, and carry out at least simple instructions and non-detailed tasks, but should not have constant or regular contact with the general public or contact that includes more than infrequent handling of customer complaints. (Tr. 17-18.) At Step Four, the ALJ found that plaintiff's impairments would prevent her from performing her

PRW, but that she could perform other work that existed in significant numbers in the national economy. Therefore, the ALJ concluded that plaintiff was not disabled under the Act between September 22, 2008 and May 4, 2010. (Tr. 23-24.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d 935, 942 (8th Cir. 2009). A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to

Steps Four and Five.  Id.  Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform her PRW.  Id.  The claimant bears the burden of demonstrating she is no longer able to return to her PRW.  Id.  If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work.  Id.

## V. DISCUSSION

Plaintiff argues the ALJ erred: (1) in determining her RFC; (2) in assessing her credibility; (3) in rejecting the opinions of her treating physicians; and (4) in relying on improper VE testimony and improperly formulating the hypothetical question to the VE.

### 1.     Residual Functional Capacity (RFC)

Plaintiff argues that the ALJ erred in determining her RFC.  She argues that the ALJ failed to find additional limitations supported by the record evidence arising out of her mental and physical impairments, failed to properly analyze the medical evidence, and failed to provide sufficient support for her RFC determination.  The undersigned agrees.

Residual functional capacity is a function-by-function assessment of an individual's ability to do work-related activities based on all the evidence.  Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007).  The ALJ retains the responsibility of determining a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians, examining physicians, and others, as well as the claimant's own descriptions of her limitations.  Pearsall v. Massanari, 274 F.3d 1211, 1217-18 (8th Cir. 2001).  Before determining a claimant's RFC, the ALJ must evaluate the claimant's credibility.  Id.  Ultimately, the RFC is a medical question, which must be supported by medical evidence contained in the record. Casey, 503 F.3d at 697; Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

Here, the ALJ determined plaintiff had the RFC to lift and carry 50 pounds occasionally and 25 pounds frequently.  She could understand, remember, and carry out at least simple

instructions and non-detailed tasks, but should not work in a setting which includes constant or regular contact with the general public or which includes more than infrequent handling of customer complaints. (Tr. 17-18.)

Plaintiff testified to significant limitations arising from her condition, specifically, that she has difficulty getting out of bed in the morning and she usually stays home in bed due to back pain. Due to her HIV and medications, she is sometimes sick for three days and then able to function for a couple days, but she gets very tired and is lucky to get four hours of sleep a night. She has good and bad days, and on bad days, which total about three weeks out of the month, she has anxiety, panic attacks, stress, and fatigue, feels tired, and is sometimes not able to cook meals. She testified that she gets frequent migraines, back pain, vomiting, and diarrhea on a bad day, and she associates these symptoms with her HIV medications. (Tr. 45-56, 51-54.)

The record evidence, including the opinions of Drs. Borrine and Stotler, are consistent with plaintiff's testimony. (Tr. 435-39, 442-44, 745, 805-07.) Dr. Borrine's October 30, 2009 Mental RFC Questionnaire answers noted no useful ability in nine areas necessary to do unskilled work, as well as inability to meet competitive standards in three such areas. He further opined that plaintiff would be absent more than four days per month due to her impairments. (Tr. 442-44.)

Dr. Stotler's October 22, 2009 Mental RFC Questionnaire answers stated that plaintiff's clinical findings included poor focus and concentration, mood swings, anxiety, depression, being easily overwhelmed, poor sleep, and apathy. He also noted decreased energy, mood disturbance, and sleep disturbance. Dr. Stotler noted inability to meet competitive standards in 10 areas necessary to unskilled work, and no useful ability to function in three other such areas. He opined that plaintiff would need to be absent more than four days per month due to her condition. (Tr. 435-39.)

In April 1, 2010 correspondence Dr. Stotler stated that plaintiff suffers from mood swings, severe anxiety and panic attacks, that her focus remains poor, and that she has

difficulty getting along with others or maintaining socially appropriate behavior. (Tr. 745.) He stated that she can become hostile and irritable under normal stress and opined that she is unable to maintain the focus and social skills necessary to remain employed. Id. Dr. Stotler's September 24, 2010, Mental Medical Source Statement noted extreme limitation in three of the five areas of activities of daily living and in all of the five areas of concentration, persistence, and pace. He opined that plaintiff would need to be absent three or more times per month and that she would be late for work three or more times per month. (Tr. 804-07.)

The medical record evidence addressing plaintiff's mental health is consistent with plaintiff's testimony and the opinions of her treating physicians. For example, Dr. Borrine's October 30, 2009 evaluation noted low energy, being bedridden all day, insomnia, and sleeping only 3-4 hours per night. A mental status exam revealed pressured speech and limited concentration. Dr. Borrine indicated a GAF of 45, and indicated highest GAF of 45 over the past year. Dr. Borrine noted marked impairment with activities of daily living, with social functioning, and with concentration, persistence and pace. (Tr. 445-47, 685-86, 688, 739-40, 748-49, 753, 758-62, 773, 791, 793-94, 923, 926-27, 934-35, 951-55, 957.)

In September 2008, plaintiff reported a history of depression and was taking Seroquel and Adderall. In October 2008, she reported sleep disturbance, a desire to be alone, and constant worrying. On October 29, 2008, Dr. Stotler noted that plaintiff had anger issues; that she cried a lot, slept poorly, and was fatigued; and that she exhibited apathy, decreased motivation, and reduced focus. Her mental status examination revealed a disheveled appearance, sad affect, and a depressed and anxious mood. Dr. Stotler indicated a GAF of 58. December 22, 2008 notes state she continued having difficulty sleeping. (Tr. 757-58, 760-62, 953-57.)

Record evidence from January to November 2009 indicates that plaintiff reported being afraid of other people; that she was labile, depressed, angry, and anxious, and that she had paranoia and obsessive thoughts, as well as mood swings and depression; that she had continued difficulty sleeping; that she showed sadness and irritability; and that she took anti-

depressants and other prescription medications for her condition. (Tr. 685-86, 688, 748-49, 752-53, 923, 934-35, 951-52.)

On February 1, 2010, Dr. Borrine noted a labile, depressed, anxious, and angry mood, as well as distractible, obsessive, and compulsive thoughts. (Tr. 773). On February 18, 2010, Dr. Stotler noted plaintiff complained of financial stress, irritability, nightmares, mood swings, and agitation. (Tr. 739-40.)

Despite the foregoing, the ALJ rejected additional limitations arising from plaintiff's impairments. The ALJ noted that plaintiff did not leave work solely as a result of her mental impairments, but because a coworker had made her angry. (Tr. 19.) The ALJ did not appear to consider that plaintiff's irritability, anger, and inability to get along with others, may have been symptomatic of her mental impairment, i.e., her depression. The ALJ also stated that plaintiff's HIV was relatively stable and unchanged, which did not account for the side affects of her HIV medications, including feeling ill and nauseous. (Tr. 19, 49, 54, 790.)

The ALJ also stated that plaintiff canceled all appointments between December 17, 2008 and February 18, 2009, concluding that this indicated a lack of severity of impairments or symptoms. (Tr. 19.) However, the ALJ did not account for the fact that during that period, plaintiff saw Drs. Borrine and Stotler on four occasions, which is inconsistent with the ALJ's finding. (Tr. 753-54, 756, 953.) The ALJ stated that the record evidence did not document significant limitations with activities of daily living. (Tr. 22.) However, the record evidence reveals disturbed and poor sleep (Tr. 435, 445, 686, 759, 923, 952-53, 955), as well as side effects from medications, including drowsiness and lethargy. (Tr. 435.)

The ALJ also concluded the record evidence showed several instances of non-compliance. (Tr. 22.) However, the ALJ did not consider that plaintiff may have had good reasons for her inability to see her physicians or take medications. See 20 C.F.R. § 404.1530; SSR 82-59 ("justifiable cause for failure to follow prescribed treatment" includes evidence that the claimant "is unable to afford prescribed treatment which he or she is willing to accept, but for which free community resources are unavailable.") See also Pate-Fires, 564

F.3d at 945 (recognizing that mentally ill claimant's noncompliance may be result of mental impairment). In this case, the record evidence that plaintiff was depressed, had financial problems, and that she sometimes could not afford her medications, was not considered by the ALJ in discussing plaintiff's purported noncompliance. (Tr. 721, 760-62, 872.)

The ALJ also gave an insufficient explanation for her RFC finding. The ALJ found exertional limitations after having found mental impairments as the only severe impairments, without explaining this apparent contradiction. (Tr. 17-18.) The ALJ also did not cite sufficient medical evidence contradicting plaintiff's testimony or the opinions of her treating sources. In light of all of the foregoing, the undersigned finds that the ALJ's decision is not supported by substantial evidence.

### 2. Credibility

Plaintiff argues the ALJ erred in assessing her credibility by failing to make sufficiently specific findings regarding her testimony, and by relying on improper observations at the hearing.

The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts. Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, a court will normally defer to the ALJ's credibility determination. Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003). For the following reasons, the court finds that the reasons offered by the ALJ in support of her credibility determination are not based on substantial evidence.

Here, the ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, but that her statements concerning the intensity, persistence, and limiting effects of such symptoms had only limited credibility and were only supported to the extent expressed in her RFC determination. (Tr. 23.) As discussed above, plaintiff's testimony was supported by the record evidence. The ALJ did not sufficiently cite medical evidence contradicting plaintiff's testimony on specific issues,

including her limitations resulting from the side effects of her medications. The ALJ did not offer a sufficient explanation of which of plaintiff's statements were not credible, or the extent to which they were or were not credible. Id. The ALJ also indicated that she relied on observations of plaintiff at the hearing, as well as her interactions with counsel, in finding that plaintiff lacked significant impairment. (Tr. 17.) This was error. Cf. Johnson v. Apfel, 240 F.3d 1145, 1147-48 (8th Cir. 2001) (while the ALJ's observations of a claimant's demeanor are a proper factor in making a credibility determination, relying upon these observations is error in the context of analyzing whether a plaintiff's impairments met a listing.) In addition, the record in fact shows that plaintiff had significant difficulty testifying. In light of the foregoing, the ALJ erred.

### 3. Opinions of Treating Physicians

Plaintiff argues that the ALJ erred in rejecting the opinions of Drs. Hinrichs, Stotler, and Borrine. The undersigned agrees.

A treating physician is normally entitled to great weight. Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000). An ALJ must give a treating physician's opinion controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. See Brace v. Astrue, 578 F.3d 882, 885 (8th Cir. 2009)(citing 20 C.F.R. §§ 404.1527(c); 416.927(c)(2)). If the opinion fails to meet these criteria, however, the ALJ need not accept it. Brace, 578 F.3d at 885.

In this case, the ALJ failed to account for these doctors' role as treating experts with superior knowledge of plaintiff's treatment. See 20 C.F.R. §§ 404.1527(c), 416.927(c). The ALJ rejected Dr. Hinrichs's opinion as conclusory, providing "little explanation," and inconsistent with treatment records. (Tr. 20.) The ALJ similarly rejected Dr. Stotler's opinion as unsupported by treatment records. (Tr. 21.) The ALJ found that the "evidentiary value" of Dr. Borrine's opinion was "limited" and was not supported by his treatment records. (Tr. 22.)

As discussed above, the opinions of Drs. Hinrichs, Borrine, and Stotler were consistent with and supported by the medical records. The ALJ concluded that if the physicians' opinions were accurate, they would have referred plaintiff for hospitalization or more aggressive treatment. (Tr. 20-22.) This statement appears to reflect the ALJ's improper formulation of a medical opinion. See Ness v. Sullivan, 904 F.2d 432, 435 (8th Cir. 1990) (ALJ must not substitute his or her opinion for that of a physician; ALJ erred in substituting his observation that claimant did not appear to be depressed or unhealthy during the hearing for her doctor's opinion that claimant was suffering from depression).

The opinions of Drs. Hinrichs, Borrine, and Stotler are based on their observations and treatment of plaintiff, all of whom are qualified to treat plaintiff. Their opinions are uncontradicted by other medical evidence in the record. Therefore, this court concludes their opinions and reports constitute substantial evidence which detracts from the decision of the ALJ.

Based on the above, the ALJ erred in considering the medical opinion evidence in the record.

### 4. Vocational Expert Testimony

Plaintiff next argues the ALJ erred in formulating the hypothetical question to the VE and in relying on improper VE testimony. She argues that the ALJ's hypothetical question merely stated the ALJ's findings, without referencing age or education. She contends that the ALJ asked the VE to comment on her oral ruling rather than asking hypothetical vocational facts, which served to bias the VE, and for all practical purposes, closed the record before her attorney had an opportunity to question the VE. The undersigned disagrees.

At the hearing, the VE confirmed that she had heard plaintiff's testimony and read the relevant vocational information contained in plaintiff's file, which included plaintiff's age and education. (Tr. 78-79.) It was therefore unnecessary for the ALJ to recite these qualifications as a matter of course. The colloquy between the VE and the ALJ demonstrates that the ALJ

asked the VE to assume that plaintiff was limited to medium, unskilled work, and that there remained jobs available to an individual with those limitations. The ALJ then included two additional limitations: limited contact with the public and only infrequent handling of customer complaints. With those limitations, the VE testified that there were jobs available in the light, unskilled work category such as housekeeping cleaner, hand presser, and electrode cleaner. (Tr. 81-83.) The ALJ did not close the record. Rather, counsel was able to question the VE, and he affirmatively stated that he had no other questions for the VE. (Tr. 84.) The undersigned therefore concludes that the ALJ did not err in relying on the VE's testimony as substantial evidence.

## VI. RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be reversed and remanded under Sentence 4 of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

The parties are advised that they have 14 days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

   /S/   David D. Noce   
**UNITED STATES MAGISTRATE JUDGE**

Signed on October 29, 2013.